## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ANNIE LUCILE LIVINGSTON, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 18-2210-KHV |
| | ) | |
| UNIVERSITY OF KANSAS HOSPITAL | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Annie Lucile Livingston filed suit against the University of Kansas Hospital Association ("UKHA"), alleging that it discriminated against her on the basis of race and religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and retaliated against her for filing this lawsuit. This matter is before the Court on Defendant University Of Kansas Hospital Authority's Motion For Summary Judgment (Doc. #67) filed October 1, 2019 and plaintiff's Motion For Leave To File An Amended Response To Defendant's Motion For Summary Judgment (Doc. #82) filed December 5, 2019. For reasons stated below, the Court sustains defendant's motion for summary judgment and overrules plaintiff's motion to file an amended response.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the

suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 62 5 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment. Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018). The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative. Liberty Lobby, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

The Court affords a pro se plaintiff some leniency and must liberally construe the pleadings. See Oltremari v. Kan. Soc. & Rehab. Serv., 871 F. Supp. 1331, 1333 (D. Kan. 1994). While the Court construes pro se pleadings liberally and holds them to less stringent standards than pleadings drafted by lawyers, a pro se party must follow the same procedural rules as other litigants. See Hughes v. Rowe, 449 U.S. 5, 9 (1980); Garrett v. Selby Connor Maddux & Janer,

425 F.3d 836, 840 (10th Cir. 2005); <u>Green v. Dorrell</u>, 969 F.2d 915, 917 (10th Cir. 1992).  The Court may not assume the role of advocate for a pro se litigant.  <u>See</u> <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).

Here, plaintiff received notice of the federal and local rules governing summary judgment. On October 1, 2019, as local rule 56.1(f) requires, defendant served its <u>[]Notice To Pro Se Litigant Who Opposes A Motion [For] Summary Judgment</u> (Doc. #66).  The notice advised plaintiff that to avoid the Court dismissing her claims and entering judgment in favor of defendant, she must timely respond to the motion by filing sworn affidavits and other documents as required by Rule 56(c), Fed. R. Civ. P., and D. Kan. Rule 56.1.  <u>See</u> <u>id.</u> at 1–2.  Along with the notice, defendant provided copies of the full text of Rule 56, Fed. R. Civ. P., and D. Kan. Rule 56.1.  <u>See</u> Exhibit 1 to <u>Notice To Pro Se Litigant</u> (Doc. #66).

## **Factual Background**

Plaintiff has attempted to controvert many of defendant's facts and set forth additional facts, but most of plaintiff's responses and factual statements do not comply with D. Kan. Rule 56.1 and are insufficient for one or more of the following reasons:

1.  Plaintiff has set forth 103 additional statements of fact even though many of those same facts, or at least defendant's version, are included in defendant's statement of facts.  A non-moving party's additional facts should address only "facts not contained in movant's memorandum."  D. Kan. Rule 56.1(b)(2).

2.  Plaintiff did not respond to many of defendant's facts.  <u>See, e.g.</u>, <u>Memorandum In Support Of Plaintiff's Response</u> (Doc. #79), responses to defendant's facts ¶¶ 2–4, 6–13, 16–20, 21a, 24, 26, 35, 37, 58b–d.

3.  Plaintiff attempts to controvert many of defendant's facts by arguing that they are

"irrelevant" or "disputed" with no further explanation or citation.  See, e.g., id., responses to defendant's facts ¶¶ 5, 14, 21b, 21c, 22a, 28–34, 38, 41–42, 81–94, 96, 98–104, 106–10, 112–14, 117–19, 121–25, 129, 131, 151, 168, 169–72.  Such responses are insufficient to controvert the alleged facts and do not comply with Rule 56(c), Fed. R. Civ. P., or D. Kan. Rule 56.1(b) and (e). See Mondaine v. Am. Drug Stores, Inc., 408 F. Supp.2d 1169, 1176 (D. Kan. 2006).  Therefore, many of defendants' statement of facts are deemed admitted.

4.  Many of plaintiff's responses do not specifically address the substance of the matter asserted.  Plaintiff repeatedly states that a factual statement is "disputed," see, e.g., Memorandum In Support Of Plaintiff's Response (Doc. #79), responses to defendant's facts ¶¶ 15, 22b–22d, 23, 27, 43, 44, 45, 116, 127–28, 130, 149–50, 152–53, with commentary that does not explain any deficiency in the manner or form of the statement of fact or what portion of defendant's statement she admits and what portion she denies.  In some responses, plaintiff responds that she is not privy to the information.  See id., responses to defendant's facts ¶¶ 33, 43, 49.  Plaintiff's attempt to controvert facts in this manner is insufficient under D. Kan. Rule 56.1, which provides that all material facts set forth in the movant's statement shall be deemed admitted unless "specifically controverted" by the opposing party.  D. Kan. Rule 56.1(d).  Under D. Kan. Rule 56.1(e) and basic principles of persuasion, a responding party has a duty to fairly meet the substance of the matter asserted.  See D. Kan. Rule 56.1(e); see also D. Kan. General Practice Guidelines, Summary Judgment, No. 11 ("If a factual assertion is controverted only in part, the response should make clear which portion is controverted and which part is not controverted.").

5.  Plaintiff includes numerous factual assertions with incomplete, inaccurate or no citations to the factual record.  See, e.g., Memorandum In Support Of Plaintiff's Response (Doc. #79), responses to defendant's facts ¶¶ 62–65, 178.  For example, in response to defendant's

statement of fact number 25, plaintiff states that she never received training on Policy 701 and cites her affidavit generally.  Plaintiff's five-page affidavit does not mention training or Policy 701. See Affidavit Of Annie Lucille Livingston (Doc. #79-6).  Under D. Kan. Rule 56.1(b), all factual statements shall refer with particularity to those portions of the record on which the non-movant relies. D. Kan. Rule 56.1(b); Fed. R. Civ. P. 56(c)(1) and (3).  It is the non-movant's "burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record."  Cross v. The Home Depot, 390 F.3d 1283, 1290 (10th Cir. 2004) (quotation marks and citation omitted); see also Handy v. City of Sheridan, 636 F. App'x 728, 2016 WL 66170, at *13 n.15 (10th Cir. Jan. 6, 2016) (district court had no duty to review record independently for evidence not cited by pro se plaintiff that might negate summary judgment); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (judges not like pigs hunting for truffles buried in briefs).

6.    Plaintiff attempts to support some statements solely by the fact that defendant objected to her prior discovery requests or that a document on the subject is included in defendant's privilege log.  For example, plaintiff states that "Gangel did not issue [] Colling a verbal written warning for yelling at [plaintiff] in May 2017."  Memorandum In Support Of Plaintiff's Response (Doc. #79), plaintiff's statement of fact ¶ 31.  Plaintiff cites no support for this fact, but notes that in discovery, defendant refused to produce Colling's HR record upon request.  See id.; see also plaintiff's statements of fact ¶¶ 48, 66, 83, 84, 95, 102, 103 (parts 1–3).  On June 3, 2019, plaintiff filed a motion to compel defendant to produce responses to more than 200 requests for production of documents.  See Plaintiff's Motion To Compel Defendant To Produce Plaintiff's Requests For Production Of Documents (Doc. #47) at 5 (seeking to compel responses to Request Nos. 1, 3–23, 25–44, 46–71, 73–74, 76–80, 82, 85–114, 116–17, 119–52, 154–55, 157–61, 163–200, 202–04,

206–19, 221–46 & 248–50).   On June 14, 2019, Magistrate Judge James P. O'Hara denied

plaintiff's motion in its entirety.   See Order (Doc. #54).   Plaintiff did not object to Judge O'Hara's

ruling.   Accordingly, she is not entitled to an inference that if defendant had responded to certain

requests, the documents would have provided evidentiary support for her statement of facts.

The Court has no desire to make "technical minefields" of summary judgment proceedings,

but neither can it permit laxness in the proper and timely presentation of proof.   Orsi v. Kirkwood,

999 F.2d 86, 92 (4th Cir. 1993).   Despite the deficiencies in plaintiff's responses to defendant's

factual statements, where the information is readily apparent in the summary judgment record of

nearly 600 pages, the Court has gone beyond plaintiff's citations in an attempt to properly set forth

the facts in a light most favorable to plaintiff and to determine whether genuine issues of material

fact preclude the entry of summary judgment for defendant.

The following material facts are uncontroverted, deemed admitted or, where controverted,

viewed in the light most favorable to plaintiff, the non-movant.

Plaintiff is African-American.   From March 28, 2016 until August 8, 2018, she worked as

a Volunteer Coordinator at the University of Kansas Hospital Authority ("UKHA").   Plaintiff

reported directly to Paula Gangel, a white female, who was UKHA's Director of Volunteer

Services.   Gangel hired plaintiff after interviews with numerous candidates.   Anita Bosch was

UKHA's Director of Labor Relations while plaintiff worked there.   In May of 2016, UKHA hired

Wendy Colling, a white female, as Gangel's administrative assistant.[1]

---

[1]        In an attempt to show that plaintiff was similarly situated to Colling and that Gangel
treated African-Americans less favorably than white employees, plaintiff submits the declaration
of Bulah Briscoe, who was an Information Desk Associate at UKHA.   See Declaration Of Bulah
Briscoe (Doc. #79-8) ¶ 6.   Briscoe makes a litany of statements about Gangel including that she
wrote up African-Americans for insignificant offenses while she did not write up Caucasians as
quickly, but provides little information to explain the basis of her knowledge.   See id., ¶¶ 46–47.
(continued . . .)

Plaintiff received, had access to, and was trained on various UKHA policies during her employment. These policies included UKHA's Equal Employment Opportunity Policy, Employee Conduct and Corrective Action Policy (Policy 701), Attendance and Tardiness Policy and the Health System Standards of Excellence.

The Equal Employment Opportunity Policy provides in part that UKHA (1) does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, ancestry, age, sexual orientation, disability, military or veteran status, membership in the uniformed services or any other characteristic protected by law and (2) strictly prohibits unlawful discrimination and harassment by its employees, agents and non-employees.

In part, Policy 701 states that employees are expected to (1) maintain a professional attitude, appearance and demeanor while at work and (2) treat everyone with whom they come into contact while at work with courtesy and respect.

The Health System Standards of Excellence provide expectations of service excellence. In part, it states that employees should (1) treat one another as professionals deserving courtesy, honesty and respect; (2) cooperate and support each other's efforts and (3) seek a private location for a problem solving conversation.

UKHA expected plaintiff as Volunteer Coordinator to interview, place, train and supervise volunteers for various KU-affiliated locations. UKHA also expected plaintiff to plan and carry

---

[1](…continued)
Briscoe did not have supervisory responsibilities and she was in the Information Desk Associates group that was distinct from the Volunteer Services Administrative Staff which included Gangel, plaintiff, Colling and Dori Tompkins. See id., ¶¶ 164–65. Accordingly, because Briscoe has not set forth the source of her knowledge on numerous topics, the Court has largely excluded plaintiff's statements of fact that rely on Briscoe's declaration. See D. Kan. Rule 56.1(d) ("Affidavits or declarations must be made on personal knowledge and by a person competent to testify to the facts stated that are admissible in evidence.").

out orientations for new volunteers, and to organize and implement recognition events for volunteers.  Volunteers generally consisted of older individuals such as retirees wanting to give back to their community.  Plaintiff also maintained a monthly work calendar for employees at the Information Desk and distributed that calendar.

Dori Tompkins, a white female, worked with plaintiff and was the only other volunteer coordinator.  Tompkins had similar duties and responsibilities as plaintiff, but Tompkins served off site while plaintiff served at the main campus.  In August of 2016, Tompkins told Gangel that the volunteer coordinator job descriptions might need updating.  In response, Gangel asked Tompkins and plaintiff to update and revise their job descriptions to reflect their true duties and responsibilities.  On September 27, 2016, Tompkins emailed plaintiff her final draft job description, asking plaintiff if she wanted to compare each other's draft job descriptions and align them as much as possible.  Plaintiff had not made any changes, however, to her job description.  Tompkins eventually gave her suggested changes to Gangel.  Plaintiff did not provide any input to Gangel about her job description.  Based on Tompkins's input, Gangel changed Tompkins's job title to "Volunteer Education Development Coordinator."  The change to Tompkins's title had no effect on her rate of pay.

Starting sometime shortly before July of 2016, Gangel wanted to fire plaintiff and on several occasions told Clarence Smith, a UKHA employee, that she intended to do so.  Declaration Of Clarence Smith (Doc. #79-14) ¶¶ 6–8, 17–18.  Gangel made the comments to Smith both at work and during classes that they took together at a local university.  See id.  Gangel told Smith that "she was trying to fire plaintiff so that Colling could replace plaintiff as the Volunteer Coordinator."  See id., ¶ 19.  Gangel thought that "she would work better with [] Colling."  See id., ¶ 21.

## I.      Provisional Evaluation

In June of 2016, Gangel placed plaintiff in charge of the junior volunteer program.  Junior volunteers, between the ages of 14 and 17, participated in an eight-week summer program. Plaintiff was responsible for the orientation event for junior volunteers on June 13, 2016.  On her own and without consulting Gangel or anyone else, plaintiff changed the orientation schedule, revised the orientation handout and failed to use the adult volunteer who had come in to help lead the volunteer tours.[2] Following the orientation session, several individuals, including Colling and Tompkins, complained to Gangel about plaintiff's actions in planning and carrying out the orientation.  Colling and Tompkins also told plaintiff that they were upset how she handled the event.

Gangel provided employees both informal and formal feedback regarding their performance.  As part of each evaluation, employees were required to complete a self-evaluation in which they rated their performance out of 5.0 points in each of several categories.

On September 30, 2016, Gangel gave plaintiff a provisional performance evaluation with an overall rating of 3.98 out of 5.0, which was generally higher than the scores received by others in the Volunteer Services Department.  The evaluation included a comparison of plaintiff's self-evaluation and Gangel's evaluation.  In the category of "Communication," Gangel rated plaintiff a 3.0 out of 5.0 ("Consistently Meets Expectations") while plaintiff ranked herself a 4.0.  In the category of "Overall job performance of duties and responsibilities as outlined in the job description," Gangel rated plaintiff a 5.0 out of 5.0 ("Significantly Exceeds Expectations") while

---

[2]      Plaintiff also changed the location of the orientation, but Gangel gave her permission to make that change.

plaintiff rated herself a 4.0.  In all other categories, Gangel rated plaintiff the same as plaintiff had rated herself.

In the "Communication" category, Gangel noted plaintiff's unilateral changes to the junior volunteer orientation.  Gangel thought that this issue illustrated plaintiff's failure to effectively communicate with staff, as well as with junior volunteers and their parents.  Gangel did not discipline plaintiff for this issue and the Provisional Evaluation had no effect on plaintiff's employment.  Gangel used the Provisional Evaluation to notify plaintiff of her concerns to help plaintiff improve communication skills.

On October 31, 2016, plaintiff emailed Eileen Stanton, Employee Relations Specialist in Human Resources ("HR"), stating that Gangel had "willfully plac[ed] inaccurate information in [her] provisional evaluation."  In the e-mail, plaintiff did not specifically mention discrimination, retaliation or race.  Plaintiff requested that HR remove from the evaluation Gangel's comment that plaintiff moved the orientation location without permission.  On November 9, 2016, Stanton met with plaintiff about the evaluation.  Again, plaintiff never mentioned discrimination, retaliation or race in the meeting.  After the meeting, plaintiff notified Jeff Novorr, Vice President of Support Operations, who determined that the evaluation was appropriate and denied plaintiff's request to remove the comment about the change in the orientation location.

## II.    Verbal Counseling – May 31, 2017

In May of 2017, plaintiff asked Gangel to move Colling to a different office so that plaintiff could have her own office.  Gangel approved moving Colling to the volunteer workroom.  Because Gangel and Colling needed to access volunteer files, Gangel decided to also move the locked filing cabinet containing volunteer files to the volunteer workroom.  Gangel was ultimately responsible for the volunteer files.

On May 24, 2017, plaintiff met Collins and Gangel.  Plaintiff stated her concern for the confidentiality of volunteer files and complained about them being moved from her office to the volunteer workroom.  Plaintiff and Colling were yelling at each other in the presence of Gangel. Gangel was surprised by plaintiff's outburst because plaintiff had requested that Colling move out of the shared office space.  Gangel assured plaintiff that the files would be kept secure.  Plaintiff continued to express anger to Gangel and Colling about the files being moved.  Plaintiff demanded that the files remain in her office.  Plaintiff announced that she was going to check with HR because she was sure that moving the files constituted a violation of the confidentiality policy. In Colling's presence, plaintiff told Gangel that this was not an appropriate way to run the department.

Ultimately, Gangel allowed the volunteer files to remain in plaintiff's office.  On May 31, 2017, however, Gangel gave plaintiff a Verbal Counseling for her "unprofessional and insubordinate outburst" on May 24.  Gangel documented the Verbal Counseling and referenced Policy 701 and the Health System Standards of Excellence.  Gangel reminded plaintiff that she should address suggestions to her in private and that they should be phrased as recommendations, not demands.

### III.    Request For Leave And Clarification Of Job Duties – November 2017

On November 7, 2017, Gangel approved plaintiff's request to leave work early that day between 3:00 and 3:30 PM.  Plaintiff left work at 1:03 PM that day.  On November 13, 2017, Gangel emailed plaintiff and stated that her leaving earlier than requested was an example of her lack of respect for Gangel as an authority figure.  Even though plaintiff had violated UKHA's Attendance and Tardiness Policy, Gangel did not discipline her.  On November 13, after plaintiff received the email from Gangel about leaving early, plaintiff asked for clarity regarding her job description.  On November 15, 2017, at plaintiff's request, Gangel met with plaintiff and Novorr

to address the relationship between Gangel and plaintiff and to reset expectations.

## IV.    Written Warning – November 28, 2017

On November 28, 2017, Gangel gave plaintiff a written warning based on the following

three incidents:

> 1. On November 6, 2017, the day before Cambridge Tower A's grand opening, two employees were scheduled to work from 9:00 to 11:00 a.m. to set up supplies at work stations including the volunteer workroom. Without notifying Gangel who had worked with plaintiff to finalize the schedule and specifically approved the scheduled shift on November 6, plaintiff called those employees and canceled their shift. As a result, Cambridge Tower A did not have adequate supplies on opening day. Plaintiff's failure to properly notify Gangel or request her permission to alter the schedule led to employee complaints about the lack of supplies.

> 2. On November 13, 2017, Laura Chaudhry was scheduled to start as a new Information Desk Associate. Plaintiff erroneously scheduled Chaudhry for November 12, the day before her start date.

> 3. On November 3, 2017, plaintiff had an encounter with Carter Clough, an Information Desk Associate, in the parking garage, in which both plaintiff and Clough raised their voices. Gangel noticed a witness account that plaintiff's conduct was "confrontational and non-supportive."

The Written Warning referenced Policy 701 and the Health System Standards of Excellence. The

Written Warning included a plan for plaintiff to attain goals set by Gangel including that plaintiff

should "remain professional and respectful in all communication," "follow the directions of [her]

Director," and that "[s]uggestions to [her] Director should be addressed in private, and should be

phrased as recommendations, not demands or directives." The Written Warning further noted that

plaintiff's behavior failed to meet the requirements of her job description. The Written Warning

further provided that if the goals were not met, "[f]urther corrective action up to and including

termination of [plaintiff's] employment" could result.

## V.    Final Written Warning And Action Plan – May 2018

Gangel and Colling were in charge of implementing UKHA's Roving Reader volunteer

book program which had volunteers transport books by cart to patients, especially long-term patients, to read during their stays. Plaintiff understood that she was not responsible for the book program. On April 11, 2018, Gangel explained the program at an administrative meeting which plaintiff attended. Plaintiff told Gangel that she did not like the program. Because the Volunteer Department had only a small collection of books at that time, Gangel and Colling sought donations of more books to increase the size of the library. Fancy Ellerman, an employee in Organizational Improvement at UKHA, had donated several books for the program and agreed to donate additional books. In early April before the administrative meeting, Ellerman told plaintiff of her plans to donate more books to the volunteer book program. In response, contrary to Gangel and Colling's desire and directive to expand the program, plaintiff told Ellerman that Colling, who was in charge of the donation process, was "[t]oo nice to say" they had enough books and did not need any more. Plaintiff admits that her comment upset Colling.

On May 7, 2018, as a result of this incident and plaintiff's continued failure to meet the behavioral standards expected of her, Gangel issued a Final Written Warning to plaintiff.[3] The Final Written Warning again referenced Policy 701 and plaintiff's prior Verbal Counseling and Written Warning. The Final Written Warning stated that if goals were not met, "further corrective action up to and including termination of [her] employment" could occur.

In addition, on May 7, 2018, because Gangel believed that plaintiff's behavior had not improved with the formal corrective actions and informal counseling, she placed plaintiff on a 30-day action plan that included one-on-one meetings with Gangel to help plaintiff improve her

---

[3]     In 2018, Gangel did not renew plaintiff's membership in the Midwest Association for Healthcare Volunteer Resource Professionals ("MAHVRP"), but approved Colling to join the organization. Colling and Gangel attended a MAHVRP conference together on May 2 and 3, 2018, immediately before Gangel issued the final written warning on May 7, 2018.

performance.  Plaintiff wrote on the action plan that "I believe I am being discriminated against based on race."  The 30-day action plan identified the following developmental needs: (1) improve communication with staff including using fewer commands and more requests, (2) be truthful in conversations, (3) develop better relationships with staff, (4) support the volunteer services initiatives such as the lending library program and (5) show respect for your supervisor by privately discussing feedback and then show support for supervisor's final decision.  The action plan stated that the time frame for improvement was "immediate and ongoing" with meeting on June 7, 2018.  On May 31, 2018, plaintiff received a slightly revised 30-day action plan which stated that the time frame for improvement was "immediate and ongoing" with a meeting date of June 29, 2018.

Gangel gave plaintiff the action plans based on the following five incidents: (1) the conversation with Clough in November of 2017; (2) plaintiff's comment to Ellerman in early April of 2018 that the volunteer department did not need any more books; (3) the incident on May 24, 2017 where plaintiff and Colling were shouting at each other in Gangel's presence; (4) in March of 2017, plaintiff's statement to Gangel in the presence of co-workers, "It doesn't do us any good to talk to you, you won't do anything about it;" and (5) on March 21, 2018, plaintiff's email to two employees about a schedule change on behalf of Gangel, without her prior approval.

On May 7, 2018, after receiving the Final Written Warning, plaintiff requested a copy of her latest job description.[4]  Gangel sent her the job description and asked plaintiff to clarify what precisely about the job description "confused" her.  On May 11, 2018, Gangel asked plaintiff to scan the job description with her "questions highlighted in red" so that she could send them to the

---

[4]       Several times throughout plaintiff's tenure at UKHA, she raised concerns about her job description shortly before or after she received disciplined.  Each time plaintiff requested information regarding her job description, Gangel worked with HR to address plaintiff's questions.

benefits department to address her "questions about management duties."

## VI.   Stand Up Meetings And Termination Of Plaintiff's Employment

Gangel had started a new partnership with Life Unlimited, Inc., a nonprofit organization, to provide volunteer experiences for individuals with intellectual disabilities, such as Autism or Asperger's Syndrome.  In the summer of 2018, two student volunteers from Life Unlimited participated in the junior volunteer program that plaintiff supervised.  The Life Unlimited students were accompanied by a Job Coach, an adult who acted as a supervisor for the students when they were volunteering on site.  As part of the junior volunteer program, plaintiff on her own decided to hold morning meetings with students which were meant to start the day by discussing soft skills that applied to the students' work.  Unbeknownst to Gangel, plaintiff also began holding what plaintiff described as "Stand Up" meetings where plaintiff made six to eight students stand at attention so she could ensure they had the correct uniform and badges while she distributed assignments for the day.  "Stand Up" meetings had not occurred before plaintiff implemented them and Gangel had not approved them.

On July 24, 2018, plaintiff led a "Stand Up" meeting with the Junior Volunteers at UKHA. At the end of the meeting, Colling asked plaintiff why she was so rude to the volunteers.   Shortly after the meeting concluded around 9:30 a.m., plaintiff went to Chris Wilson, an Employee Relations Business Partner in HR, and expressed concern about Colling's comment.  Plaintiff told Wilson that she was worried that Colling was going to report plaintiff's behavior and that plaintiff would be disciplined.  Plaintiff explained that Gangel was biased and would take Colling's side. Plaintiff gave Wilson a list of students who had volunteered that day and demanded that he call them that day while they were at the hospital.  Wilson described plaintiff as "very demanding" during this meeting.

Later in the morning on July 24, Wilson notified Gangel about his meeting with plaintiff and suggested that they add the issue to the agenda for their weekly meeting with plaintiff that afternoon.  Also that same morning, Colling complained to Gangel that plaintiff was "rude" to a special needs student volunteer at the meeting and got "in [the volunteer's] face."

At 1:00 p.m. on July 24, plaintiff, Gangel and Wilson met.  Gangel discussed plaintiff's successful completion of her 30-day action plan.  Gangel started to discuss plaintiff's annual evaluation, but because plaintiff did not believe that her self-evaluation dates coincided with Gangel's evaluation dates, they agreed, at Wilson's suggestion, to discuss the annual evaluation at a later meeting.  Plaintiff then discussed Colling's comment about being rude earlier that day. Gangel explained that Colling had a different viewpoint and asked plaintiff if she would be willing to sit down with Gangel and Colling to discuss the issue.  Plaintiff refused to meet later with Gangel and Colling.  Instead, plaintiff demanded that Gangel call all the students and Kate, the job coach, to ask them if plaintiff had been rude.  Plaintiff then gave Gangel and Wilson a list of students who had volunteered on July 24 and again demanded that the students and job coach be called by the end of the day.

Wilson supervised an investigation about plaintiff's conduct during the Stand Up meeting. On July 24 and 25, 2018, Gangel called the student volunteers.  Numerous students, including students with intellectual disabilities, reported that plaintiff made them feel embarrassed, uncomfortable, scared, whipped and intimidated.  Affidavit Of Paula Gangel (Doc. #68-2) ¶ 42. One special needs volunteer reported that plaintiff created "awkward and uncomfortable situations in the morning meetings that none of the students liked." Id., ¶ 42a.  A student volunteer reported that plaintiff yelled at him in front of everyone and publicly embarrassed him. Id., ¶ 42b.  Another student volunteer reported that all the volunteers were scared to lose a badge or not have on a belt

because plaintiff would embarrass them and make "a big deal out of it in front of everyone." Id.,

¶ 42c.[5]

After Gangel received comments from student volunteers, she emailed Kate Pankey,

Employment Specialist for Life Unlimited, Inc, and Pam Harris, Director of Life Unlimited, as

follows:

> As you know, I'm working with Annie Livingston to point out a developmental
> need, which has to do with her softening her approach/delivery and
> interpersonal/communication skill.  I am appalled that she put Sara on the spot
> Tuesday morning because she misplaced her badge.  This is not a big deal and I'm
> sorry Annie embarrassed Sara in front of the other junior volunteers.  Clearly, that
> was inappropriate and I do not approve of treating volunteers in this manner,
> especially junior volunteers.  Malinda also said that Annie often makes her feel
> uncomfortable, which isn't what we want to hear, either.  My goal is for both Sara
> and Malinda, as well as their job coaches, to have a very positive experience here
> at our hospital.  I'm dismayed that the girls have felt uncomfortable in their
> interactions with Annie.  I talked to my boss, Jeff Novorr, about this today and he
> is very concerned.  He asked me to ask Kate and Shawna as well as Malinda and
> Sara to write down their perceptions of Annie, especially the morning huddles, and
> sign it.  They both said they have felt "put on the spot" as have other volunteers
> during the morning huddles because of some minor infraction like having a sweater
> over your uniform or not having socks on, etc.  I haven't had a chance to talk to
> Shawna, but she was here for the beginning of the summer I'd be interested to get
> her point of view as well. Obviously, my goal is to build a positive relationship with
> all of you and partner with Life Unlimited in the future, to be a host site for future
> clients to volunteer.  I hope that Malinda and Sara have had a good experience,
> overall. Annie has a military background and I have reminded her that this is not
> the Citadel!  These young people are not soldiers to whip into shape before a life-
> or death battle!  Having a shirt tucked in or a missing name badge is no reason to
> reprimand a young person, and is not a life-or-death matter.  Further, I don't
> approve of putting someone on the spot.  Being a teenager is difficult-being called
> out in front of your peers is not an acceptable practice.  I am coaching Annie on
> this.  I appreciate your help and support.  Let me know if you wish to discuss further,

---

[5]      In an attempt to show that she acted appropriately at the Stand Up meetings,
plaintiff submitted the declaration of Lauren Ennis, a junior volunteer who volunteered one day
per week in 2018 for an eight-week period.  See Declaration Of Lauren Ennis (Doc. #79-36) ¶ 6.
Ennis stated that plaintiff was "kind, approachable, and respectful" to all students during the
meetings.  See id., ¶ 26.  Ennis does not state that she was at the meeting on July 24, 2018.
Moreover, her personal opinion of plaintiff's demeanor and the tone of the meetings does not refute
the fact that others (including student volunteers) reported negative comments about plaintiff to
Gangel and Wilson.

or have other concerns that I have not addressed.

Exhibit 31 to Memorandum In Support Of Plaintiff's Response (Doc. #79).  On July 27, 2018, Pankey reported to Gangel that two volunteers with developmental disabilities previously had issues with plaintiff.  One special needs volunteer had felt "uncomfortable" on several occasions with plaintiff's behavior, and the other noted plaintiff had been "very rude."  Shawna John, a Job Coach for Life Unlimited, reported that plaintiff was "abrupt in her manner of speaking and her emotions [were] very apparent on her face."

UKHA's investigation also revealed that during a meeting on July 23, 2018, plaintiff showed the junior volunteers, which included the two special needs volunteers, a video clip from the film, *The Greatest Showman*.  The video clip included a scene with a bearded lady, a man with short stature and others described in the movie as "circus freaks."  The students found the clip upsetting and offensive because it likened the "circus freaks" to the volunteers with disabilities. Plaintiff had neither sought Gangel's advice nor approval before showing the video clip.

## VII.    Termination Of Plaintiff's Employment

On August 8, 2018, at a meeting with plaintiff, Gangel, Bosch and Wilson, Bosch told plaintiff that she "had not committed any offense to be terminated for, but since [] Gangel had issued [her] a final written warning in May (2018), that her employment was being terminated today."  Gangel terminated plaintiff's employment for what Gangel described as continued failure to improve her communication skills.  Gangel gave plaintiff a termination form which outlined the reasoning for her decision.  Gangel noted (1) the comments about plaintiff's rude behavior with volunteers at Stand Up meetings, (2) showing the video clip from The Greatest Showman during one meeting, (3) demanding that Gangel call of the volunteers by the end of the day on July 24. Gangel also noted that plaintiff admitted to much of this behavior during an interview with HR on

July 31, 2018.  Finally, Gangel recited Policy 701 and then noted as follows:

> The Hospital and its Volunteer Services team has a responsibility to all volunteers to ensure the highest possible quality experience, including the use of welcoming, professional, and trusting behaviors.
>
> Despite multiple coaching efforts on May 30th, 2017 (verbally counseled about expectations of professional communication as well as following directions), November 28th, 2017 (written warning for confrontational and non-supportive communication, not following directives, and dismissive and disrespectful behavior towards your supervisor), May 7th, 2018 (final written warning for misrepresenting the department through false statements and continuing dismissive behavior towards your supervisor), and an Action Plan dated May 31st, 2018 (to improve communication, to enhance professional relationship building, and to build trust and show respect to your supervisor), you have been unable to successfully meet performance expectations.  Therefore . . .
>
> [] Your employment is terminated, effective today.

Corrective Action Form (Doc. #79-40).  In addition to formal training and counseling, Gangel met with plaintiff informally at least 25 times to address her issues related to insubordination and communication.

On April 25, 2018, plaintiff filed suit in this Court.  On May 3, 2018, plaintiff served defendant with a copy of the complaint.

At the meeting on August 8, Bosch told plaintiff that UKHA "would like to offer [her] $20,000 to help with [her] transition" and that UKHA's counsel, Henry Thomas, would contact her with the details of the offer.  Two days later, on August 10, 2018, Thomas called plaintiff and told her that the $20,000 offer that Bosch had made was contingent on plaintiff dropping her lawsuit against UKHA.

Beginning in September of 2018, HR conducted a two-month investigation into the volunteer services department.  During the investigation, HR asked at least one employee about Gangel's management style.  In November of 2018, after the investigation was completed, Gangel resigned.

## VIII.   Lawsuit

Under Title VII, plaintiff alleges that defendant discriminated against her on the basis of race and religion, and retaliated against her for filing this lawsuit.  Defendant asserts that it is entitled to summary judgment on each of plaintiff's claims.[6]

### Analysis

## I.   Plaintiff's Motion For Leave To File Amended Response (Doc. #82)

On October 1, 2019, defendant filed its motion for summary judgment.  Accordingly, plaintiff's response was originally due October 22, 2019.  See D. Kan. Rule 6.1(d)(2).  The Court sustained plaintiff's unopposed motion to extend the deadline to November 1, 2019.  See Order (Doc. #70).  The Court later sustained plaintiff's motion, which defendant opposed, to extend the deadline to November 12, 2019.  See Order (Doc. #74).  Finally, on November 12, 2019, plaintiff filed an unopposed motion to extend the deadline three additional days so that she could submit a "complete and competent response."  Motion For Third Extension Of Time To File A Response (Doc. #75) at 1.  The Court sustained plaintiff's unopposed motion, but noted that "[n]o further extensions of the response deadline will be granted."  See Order (Doc. #77).

On November 15, 2019, plaintiff filed her response brief.  See Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. #78).  Defendant's reply was originally due December 2, 2019.  See D. Kan. Rule 6.1(d)(2).  On December 1, 2019, defendant filed an unopposed motion to extend the reply deadline to December 9, 2019.  On December 9, 2019, defendant filed a reply to plaintiff's original response brief.  See Reply Brief In Support Of Defendant's Motion For Summary Judgment (Doc. #84).

---

[6]      In response to defendant's motion for summary judgment, plaintiff states that she "withdraws" her religious discrimination claim.  Memorandum In Support Of Plaintiff's Response (Doc. #79) at 1.  Accordingly, the Court dismisses this claim (Count II).

On December 5, 2019, four days before defendant filed a reply, plaintiff filed a motion for leave to file an amended response to defendant's motion for summary judgment.  Motion For Leave To File An Amended Response To Defendant's Motion For Summary Judgment (Doc. #82). Although plaintiff has titled her motion as one to amend, she essentially asks for an extension of the deadline to file a response to defendant's motion for summary judgment.  See Chubb v. Brownback, No. 14-CV-03227-DDC-DJW, 2016 WL 5410615, at *4 (D. Kan. Sept. 28, 2016) (construing motion to amend response to motion to dismiss as "request to file out of time, which requires a showing of excusable neglect" under Rule 6(b)(1)(B)); Coleman v. Blue Cross Blue Shield of Kan., 487 F. Supp. 2d 1225, 1233–34 (D. Kan. 2007) (same but in context of response to motion for summary judgment), aff'd, 287 F. App'x. 631 (10th Cir. 2008).   Under Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure, "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."   Fed. R. Civ. P. 6(b)(1)(B); see also D. Kan. Rule 6.1(a) ("Absent a showing of excusable neglect, the court will not grant extensions requested after the specified time expires.").

To determine whether neglect is excusable, the Court considers (1) the danger of prejudice to the opposing party, (2) the length of delay caused by the neglect and its impact on judicial proceedings, (3) the reason for delay and whether it was in the reasonable control of the moving party and (4) the existence of good faith on the part of the moving party.  Hamilton v. Water Whole Int'l Corp., 302 F. App'x. 789, 798 (10th Cir. 2008).  The reason for delay is an important, if not the most important, factor in this analysis.  Id.

    A.    Prejudice To Defendant

Because plaintiff did not notify defense counsel that she intended to file an amended

response until December 5, 2019, defense counsel expended significant resources to respond to plaintiff's original 79-page response. Faced with a deadline of December 9, 2019 to file a reply to plaintiff's original response, defendant did so and then filed a brief in opposition to plaintiff's request to file an amended response. Plaintiff's proposed amended response is 148 pages (69 pages longer than original response) and includes 116 exhibits (76 more exhibits than original response). If the Court granted plaintiff's request to amend her response, defendant would be prejudiced because it would need to file a new reply to a response that appears to be substantially longer and different than the original response. This factor therefore weighs in favor of defendant.

  B.  <u>Length Of Delay And Impact On Judicial Proceedings</u>

  As noted, the delay in this case was 20 days, which is relatively short in the context of this case that plaintiff filed nearly two years ago. If the Court granted plaintiff's motion to file an amended response, however, the delay in judicial proceedings would be several months because defendant would be entitled to file a new reply brief and continue trial which is currently scheduled for May 12, 2020. Therefore this factor slightly favors defendant.

  C.  <u>Reason For The Delay And Whether It Was In Plaintiff's Control</u>

  Plaintiff states that the reason for delay was that she severely underestimated how long it would take to properly respond to defendant's motion for summary judgment. <u>Motion For Leave To File An Amended Response To Defendant's Motion For Summary Judgment</u> (Doc. #82) at 1. Plaintiff explains that as of November 15, 2019, she had three options: (1) to file a timely disjointed response; (2) to file an untimely reasonably organized response, or (3) not file a response at all. <u>Id.</u> at 2; <u>see also</u> <u>id.</u> at 1 (as of November 15, plaintiff was in process of "aligning three draft documents with her main document"). Plaintiff states that she chose to file a timely response on November 15, 2019 so that she did not "offend the Court," <u>id.</u> at 1, but fails to explain

why on that same day, she did not request leave to amend her response or otherwise notify defense counsel and the Court that she intended to file an amended response at a later date.  During the 20-day delay in notifying defense counsel of her intent to amend her response, plaintiff consented to a seven-day extension of time, from December 2 to December 9, for defendant to file a reply brief to her *original* response.  Plaintiff certainly understood how to file a motion for extension of time or to amend, but simply chose not to do so for 20 days.  Both estimating the amount of time required to file a response and notifying opposing counsel and the Court that she was preparing an amended response was within plaintiff's control.  This factor weighs strongly in favor of defendant.

>   D.   Whether Movant Acted In Good Faith

Plaintiff apparently acted in good faith.  Accordingly, this factor favors plaintiff.

>   E.   Balancing Of Factors

Weighing all of the above factors, the Court finds that plaintiff has not shown excusable neglect.  As explained above, if the Court granted plaintiff leave to file a new response, defendant would have to incur the attorney fees necessary to file a new reply brief.  While plaintiff apparently acted in good faith, the Court cannot countenance her failure to seek leave earlier or otherwise notify defense counsel that she intended to file an amended response.  Plaintiff essentially concedes that the mistake was within her control, but asks the Court to nevertheless grant her leave to amend in light of her pro se status.  See id. at 2 ("Plaintiff Pro Se messed up and prays to the Court for forgiveness.").  As explained above, a pro se party must follow the same procedural rules as other litigants.  Inadvertence, ignorance of the rules and mistakes construing the rules do not constitute excusable neglect for purposes of Rule 6(b).  See Sizemore v. State of N.M. Dep't of Labor, 182 F. App'x 848, 852–53 (10th Cir. 2006) (no excusable neglect where counsel ignored deadline,

erroneously relied on Rule 6 to calculate deadline and failed to seek extension immediately upon receiving defendant's motion); Quigley v. Rosenthal, 427 F.3d 1232, 1238 (10th Cir. 2005) (no excusable neglect where counsel mistakenly construed rule and failed to timely seek attorney fees); Ghamrawi v. Case & Assocs. Props. Inc., 116 F. App'x 206, 210 (10th Cir. 2004) (no excusable neglect where counsel simply disregarded deadline because of workload).  In sum, plaintiff has not demonstrated excusable neglect.  The Court therefore overrules plaintiff's motion for leave to file an amended response to defendant's motion for summary judgment.

## II.    Race Discrimination (Count I)

Plaintiff alleges generally that she was disciplined differently because of her race.  See Pretrial Order (Doc. #65) at 5.  In its motion for summary judgment on plaintiff's race discrimination claim, defendant addresses only the termination of her employment.  In her response, plaintiff does not clarify whether she claims that she suffered any other adverse action and the Pretrial Order (Doc. #65) appears to include only a single claim based on the termination of her employment.  Even so, in addition to the termination of plaintiff's employment, the record identifies five potentially adverse actions related to her general claim that defendant disciplined her differently because of her race: (1) provisional evaluation in November of 2016, (2) Verbal Counseling on May 30, 2017, (3) Written Warning on November 28, 2017, (4) Final Written Warning on May 7, 2018, and (5) Action Plans on May 7 and 31, 2018.

A warning letter or reprimand can constitute adverse employment action only if it adversely affects the terms and conditions of the plaintiff's employment, for example, "if it affects the likelihood that plaintiff will be terminated, undermines the plaintiff's current position, or affects plaintiff's future employment opportunities."  Medina v. Income Support Div., N.M., 413 F.3d 1131, 1137 (10th Cir. 2005).

Here, the provisional evaluation in November of 2016 did not constitute discipline and did not significantly change the terms and conditions of plaintiff's employment. Accordingly, the provisional evaluation does not constitute adverse employment action.

As to the verbal counseling, written warnings and action plans, Gangel referred to all of these actions in her decision to terminate plaintiff's employment. Arguably, the counseling, warnings and action plans all constitute adverse employment actions based on the threat of further discipline in each of those documents that Gangel eventually relied on when she terminated plaintiff's employment. Cf. Dick v. Phone Directories Co., 397 F.3d 1256, 1268 (10th Cir. 2005) ("unrealized" threat of future discipline, without more, not adverse employment action). In any event, for reasons explained below, whether the Court considers the various instances of discipline collectively with respect to the termination of plaintiff's employment or independently as separate adverse employment actions, defendant is entitled to summary judgment on plaintiff's race discrimination claim.

Plaintiff may establish that defendant acted with discriminatory intent under Title VII either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973). See Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278–79 (10th Cir. 2010). Here, plaintiff relies on the indirect method of proving discrimination. Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008). If plaintiff satisfies her burden, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. McDonnell Douglas, 411 U.S. at 802–03. If defendant does so, the burden shifts back to plaintiff

to show a genuine issue of material fact whether defendant's stated reason is pretextual, i.e. unworthy of belief.  Sanders, 544 F.3d at 1105.

The precise articulation of a prima facie case depends on the context of the claim and the nature of the adverse employment action alleged.  Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005).  In general, plaintiff may make a prima facie case by showing that (1) she belongs to a protected class, (2) she suffered an adverse employment action and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  Id. at 1099–1100.  Here, neither party separately analyzes the elements of a prima facie case as to each instance of discipline.  Even if the Court assumes that plaintiff can establish a prima facie case, however, plaintiff has not demonstrated that the reasons for any of the instances of discipline including termination of her employment were a pretext for racial discrimination.

Defendant states that it terminated plaintiff's employment because she failed to demonstrate professional communication and behavior, and continued to be insubordinate.[7] Pretrial Order (Doc. #65) at 4.  Each individual instance of discipline that preceded termination included similar statements related to plaintiff's communication style and insubordination.

---

[7]        Defendant argues that because Gangel hired plaintiff and terminated her employment, plaintiff must overcome the "same actor" inference to establish pretext.  If the same person both hires and fires and an employee "within a relatively short time span," a strong inference is created that "the employer's stated reason for acting against the employee is not pretextual."  Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006) (quotation marks and citation omitted).  Of course, plaintiff still has the opportunity to present countervailing evidence of pretext to overcome the inference.  Id.  Here, the Court declines to apply the same actor inference to the decision to terminate plaintiff's employment because Gangel hired plaintiff some 29 months earlier, which is not "within a relatively short time span."  Llizo v. City of Topeka, Kan., No. 11-2302-JWL, 2012 WL 1934062, at *4 (D. Kan. May 29, 2012) (court doubts that four years is "relatively short time span"); Thomas v. iStar Fin., Inc., 438 F. Supp.2d 348, 361 (S.D.N.Y. 2006) (same actor inference inapplicable where over three years elapsed between plaintiff's hiring and firing).  Cf. Antonio, 458 F.3d at 1183 (10 months between hiring and firing). In any event, absent the same actor inference, defendant is entitled to summary judgment.

Because defendant has met its burden of offering non-discriminatory reasons for each adverse employment action, the presumption of discrimination drops from the case and plaintiff must establish by a preponderance of the evidence "that the proffered reasons [were] not the true reason for the employment decision."  Aramburu v. Boeing Co., 112 F.3d 1398, 1403 (10th Cir. 1997).  Plaintiff may show pretext by establishing either that a discriminatory reason more likely motivated defendant or that its explanations are unworthy of credence.  Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994).

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation marks and citation omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory." Id. at 1323–24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) with evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) with evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  More specifically, evidence of pretext may include, but is not limited to, the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999).

The Court construes plaintiff's response as asserting that defendant's stated reasons for discipline including the termination of her employment are pretext for race discrimination because (1) Gangel treated her differently than similarly situated employees, (2) Gangel's reason for the Verbal Counseling in May of 2017 was false, (3) Gangel's reasons for the first Written Warning in November of 2017 were false, (4) the Final Written Warning contains an inconsistency, (5) the procedural irregularity in UKHA extending her "30-day" action plan, (6) the result of the HR investigation is "implausible" and (7) Gangel stated that she wanted to fire plaintiff. [8]

### A.   Treatment Of Similarly Situated Employees

Plaintiff argues that as to discipline, Gangel treated her differently than similarly situated employees.  Under this approach, plaintiff establishes pretext by demonstrating that defendant treated her differently from comparable employees.  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167–68 (10th Cir. 2007).  To be a valid comparator, other employees must be similarly situated to plaintiff in all material respects and have violated work rules of comparable seriousness.  Id. at 1167; Lucero v. Sandia Corp., 495 F. App'x 903, 909 (10th Cir. 2012); Macon v. UPS, 743 F.3d 708, 717 (10th Cir. 2014).  In addition, a comparator must have: (1) "deal[t] with the same supervisor," and (2) been "subject to the same standards governing performance evaluation and discipline."  Aramburu, 112 F.3d at 1404.  The Court also compares the relevant employment circumstances that are applicable to plaintiff, such as work history and company policies, and the intended comparable employees.  Id.  Whether employees are similarly situated

---

[8]     Plaintiff also suggests that defendant violated its Volunteer Agreement policy because it allowed some paid Life Unlimited employees to participate in the 2018 junior volunteer program.  Memorandum In Support Of Plaintiff's Response (Doc. #79) at 73.  Even if plaintiff could show that defendant committed some technical policy violation, she has not shown how any such violation relates to the stated reasons for her discipline and the termination of her employment.

is a fact-intensive inquiry, and what facts are material varies depending on the case.  Lucero, 495

F. App'x at 909.

Disparate treatment does not create an inference of discrimination if defendant's differential treatment of similarly-situated employees is trivial or accidental or explained by a nondiscriminatory motive.  Swackhammer, 493 F.3d at 1168; see EEOC v. Flasher Co., 986 F.2d 1312, 1321 (10th Cir. 1992) (inference of illegal discrimination not legally compelled by irrational or accidental disparate treatment between minority and non-minority employees).  "[T]he existence of differential treatment[ ] defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate."  Swackhammer, 493 F.3d at 1168.

Plaintiff apparently argues that as to discipline, Gangel treated Colling, a Caucasian, more favorably than plaintiff.  Memorandum In Support Of Plaintiff's Response (Doc. #79) at 58–59. Although plaintiff and Colling both reported to Gangel, plaintiff has not shown that they were "subject to the same standards governing performance evaluation and discipline."  Aramburu, 112 F.3d at 1404.  Even if the Court assumes that plaintiff was similarly situated to Colling, plaintiff has not shown any differential treatment.[9]  Indeed, plaintiff notes that in discovery, she was unable to obtain Colling's employment records.

Plaintiff argues that in 2018, Gangel did not renew plaintiff's membership in the MAHVRP, but approved Colling to join the organization.  Plaintiff notes that Colling and Gangel attended a MAHVRP conference together on May 2 and 3, 2018, but fails to explain the

_____

[9]    Plaintiff asserts that Gangel did not discipline Colling after plaintiff and Colling yelled at each other in Gangel's presence, but plaintiff provides no evidentiary support for her assertion.

significance of this trip or how it shows that Gangel disciplined plaintiff differently than Colling for similar misconduct.  See Swackhammer, 493 F.3d at 1168 (differential treatment of trivial nature does not create inference of discrimination).

   B. <u>Falsity Of Stated Reason For Verbal Counseling</u>

   Plaintiff argues that Gangel's reason for the Verbal Counseling in May of 2017 was false. Gangel gave plaintiff a Verbal Counseling for her "unprofessional and insubordinate outburst." As part of the Verbal Counseling, Gangel reminded plaintiff that she should address suggestions to her in private and that they should be phrased as recommendations, not demands.  Plaintiff argues that Gangel disciplined her for raising a concern about the confidentiality of volunteer files, but she provides no evidence to support her assertion.  <u>Memorandum In Support Of Plaintiff's Response</u> (Doc. #79) at 61.  The Verbal Counseling, as documented by Gangel, only criticized the manner in which plaintiff raised the issue, not the fact that she raised a concern about volunteer confidentiality.

   C. <u>Falsity Of Stated Reasons For First Written Warning</u>

   Plaintiff argues that Gangel's reasons for the first Written Warning in November of 2017 were false.  As noted above, Gangel gave plaintiff a written warning based on the following three incidents: (1) without notifying Gangel who had worked with plaintiff to finalize the schedule and specifically approved the scheduled shift, plaintiff called two employees and canceled their shift, which resulted in employee complaints about the lack of supplies; (2) plaintiff erroneously scheduled Chaudhry, a new Information Desk Associate, to start work the day before her start date; and (3) plaintiff's encounter with Clough in the parking garage.

As to the first reason, plaintiff argues that Colling was in charge of making sure that the Information Desk had adequate supplies. Plaintiff provides no evidentiary support for her assertion.

As to the second reason for the Written Warning, plaintiff argues that Gangel approved the schedule that included Chaudry starting the day before her start date. Memorandum In Support Of Plaintiff's Response (Doc. #79) at 62. Plaintiff does not explain how this fact shows pretext because the Written Warning itself states that Gangel approved the schedule. Gangel disciplined plaintiff, however, because she drafted the schedule which contained the error. Plaintiff did not notify Gangel ahead of time that Chaudhry was scheduled to work the day before her start date. Accordingly, the fact that Gangel approved the schedule does not raise a genuine issue of material fact whether discipline based on plaintiff's scheduling error was a pretext for race discrimination.

As to the final reason for the Written Warning, plaintiff argues that an officer who witnessed plaintiff's confrontation with Clough, said that plaintiff was not out of line and that both of them had raised voices. Id. at 62–64. Gangel essentially included this same information in the Written Warning, but stated that when the conversation escalated, plaintiff should have ended it. The fact that a security officer may have thought that plaintiff was not out of line in raising her voice with a non-supervisory employee does not create a genuine issue of material fact whether Gangel's contrary opinion is a pretext for race discrimination.

D.      Inconsistency In Final Written Warning

Plaintiff suggests that the Final Written Warning contains an inconsistency which indicates that it was a pretext for race discrimination. Memorandum In Support Of Plaintiff's Response (Doc. #79) at 65–66. Plaintiff asserts that one or two weeks before Gangel held the administrative meeting on April 11, 2018, plaintiff told Ellerman that the volunteer department did not need any

more books.  Plaintiff maintains that in the Final Written Warning, Gangel stated that plaintiff made the comment to Ellerman *after* April 11, 2018.  In the Final Written Warning, Gangel did not specifically state when plaintiff made the statement.  Plaintiff does not explain the significance of the timing of her statement to Ellerman and she does not dispute that she understood that Gangel and Colling wanted to expand the program.  In the Final Written Warning, Gangel noted that plaintiff admitted that she made the comment to Ellerman and argued with Gangel about why the program is not viable.  In sum, plaintiff has not raised a genuine issue of material fact that any inconsistency in the Final Written Warning is pretext for race discrimination.

      E.      <u>Extensions Of 30-Day Action Plan</u>

Plaintiff suggests that some procedural irregularity occurred when UKHA extended her "30-day" action plan on two different occasions.  <u>Memorandum In Support Of Plaintiff's Response</u> (Doc. #79) at 66–67.  Plaintiff offers no evidence that suggests that this procedure was unusual or how UKHA handled this issue with other employees.  She therefore has not shown that the extensions of the action plan raises a genuine issue of material fact whether the plans were a pretext for race discrimination.  In fact, rather than suggesting pretext, the extension of the 30-day action plans could just as likely suggest that Gangel was trying to work with plaintiff.

      F.      <u>Plausibility Of The Final Investigation Result</u>

Plaintiff argues that the result of the HR investigation is "implausible" because Gangel failed to conduct an "independent fair unbiased investigation."  <u>Memorandum In Support Of Plaintiff's Response</u> (Doc. #79) at 76; <u>see</u> <u>id.</u> at 68–70, 74.  In support, plaintiff argues that Gangel's email to the two Life Unlimited employees asked them to provide negative information about plaintiff.  The entire email, which is set forth above, essentially recounted what the student volunteers had reported, explained that Gangel was in the process of coaching plaintiff on the issue

and that Pankey or Harris could contact her if they wanted to discuss the issue further or had other concerns.  The wording of Gangel's email, by itself, does not suggest that she conducted an unfair or biased investigation.  Likewise, plaintiff's statement to Wilson before the investigation that she did not believe that Gangel would conduct a fair and impartial investigation does not show that the investigation was unfair.  Plaintiff provides no other evidentiary support for her contention that the investigation was biased and unfair.

G.    <u>Gangel's Stated Intent To Fire Plaintiff</u>

Plaintiff apparently argues that because Gangel stated in 2016 that she wanted to fire plaintiff, all subsequent discipline was based on her race.  <u>Memorandum In Support Of Plaintiff's Response</u> (Doc. #79) at 59–60.  Whether as direct evidence or as evidence of pretext, Gangel's comments are insufficient to overcome summary judgment.  Starting sometime shortly before July of 2016, Gangel wanted to fire plaintiff and told Smith, a UKHA employee, on several occasions that she intended to do so.  <u>Declaration Of Clarence Smith</u> (Doc. #79-14) ¶¶ 6–8, 17–18.  Gangel made the comments to Smith both at work and during several classes that they took together at a local university.  <u>See</u> <u>id.</u>  Gangel told Smith that "she was trying to fire plaintiff so that Colling could replace plaintiff as the Volunteer Coordinator."  <u>See</u> <u>id.</u>, ¶ 19.  Gangel thought that "she would work better with [] Colling."  <u>See</u> <u>id.</u>, ¶ 21.

Smith's comments do not create a genuine issue of material fact whether Gangel's reasons for imposing the various forms of discipline are pretext for race discrimination.  Gangel did not state that she wanted to fire plaintiff because of race.  Indeed, she stated that the reason that she wanted to get rid of Gangel was she thought that she would work better with Colling.  Such a comment is entirely consistent with Gangel's stated concerns about plaintiff's communication style and insubordination.  Absent further information as to the context of Gangel's statements, no

reasonable jury could conclude that Gangel's reasons for imposing the various forms of discipline are pretext for race discrimination.

In sum, viewing the evidence in a light most favorable to plaintiff, plaintiff has not demonstrated a genuine issue of material fact whether defendant's stated reasons for discipline and termination are pretext for race discrimination.   Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's race discrimination claim.[10]

## III.    Retaliation (Count III)

Plaintiff alleges that defendant terminated her employment in retaliation for the filing of this lawsuit on April 30, 2018.[11]  Title VII makes it unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3(a).  To establish a prima facie claim for Title VII retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.  Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2002).

---

[10]    Plaintiff also cites as evidence of discrimination the fact that Gangel resigned in November of 2018 after a two-month investigation into the volunteer services department. Memorandum In Support Of Plaintiff's Response (Doc. #79) at 61.  Plaintiff has presented no evidence to explain why Gangel left or what, if any, findings resulted from the investigation.

[11]    In plaintiff's response, she also identifies as protected activity the filing of an EEOC complaint in November of 2017 and her e-mail to defense counsel in late July of 2018.  See Memorandum In Support Of Plaintiff's Response (Doc. #79) at 75.  In the pretrial order, however, the only protected activity identified is the filing of this lawsuit and the only adverse action identified is the termination of plaintiff's employment.  See Pretrial Order (Doc. #65) at 2–3, 5–6. Moreover, plaintiff did not include a factual statement related to her EEOC charge and did not attach a copy of the complaint as an exhibit to her response.  Finally, plaintiff has not shown that defense counsel, who received her e-mail request, had any influence on defendant's decision to terminate plaintiff's employment.  For these reasons, on plaintiff's retaliation claim, the Court only considers the protected activity as the filing of this lawsuit and the adverse action as the termination of her employment.

Because plaintiff seeks to prove her claim through indirect evidence, the burden-shifting analysis of McDonnell Douglas applies.  See Lujan v. Walters, 813 F.2d 1051, 1058 (10th Cir. 1987).  Thus, if plaintiff establishes a prima facie case, the burden of production shifts to defendant. If defendant offers a legitimate, nondiscriminatory reason for the action, the burden of shifts back to plaintiff to demonstrate that the proffered explanation is a pretext for retaliation.

Here, defendant assumes that plaintiff can establish a prima case of discrimination,[12] but maintains that it terminated her employment for a legitimate, non-discriminatory reason, i.e. "her continuing and never improving unprofessional communication and insubordinate behavior." Defendant University Of Kansas Hospital Authority's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #68) at 53; see Pretrial Order (Doc. #65) at 4.  Because defendant has articulated a legitimate reason for terminating plaintiff's employment, the burden shifts back to plaintiff to show that this reason is a pretext for retaliation. As with her race discrimination claim, plaintiff may show that defendant's stated reason is a pretext for retaliation by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Jones, 617 F.3d at 1280 (quotation marks and citations omitted).

As noted above, defendant states that it terminated plaintiff's employment because she failed to demonstrate professional communication and behavior, and continued to be insubordinate.   Plaintiff argues that defendant's stated reasons for the termination of her

---

[12]     In its reply brief, defendant argues that plaintiff cannot show a causal connection between the filing of her lawsuit and the termination of her employment.  See Reply Brief (Doc. #84) at 119.  The Court will not consider new arguments raised in a reply brief.  Cont'l Coal, Inc. v. Cunningham, 511 F. Supp.2d 1065, 1077 (D. Kan. 2007).

employment is pretext for retaliation because (1) the procedural irregularity in UKHA extending her "30-day" action plan, (2) the result of the HR investigation is "implausible" and (3) defendant violated its policies and procedures which require an investigation of all employee complaints of harassment or discrimination.  For the same reasons as stated above with respect to plaintiff's race discrimination claim, the procedural "irregularity" of extending the 30-day action plan and the plausibility of the result of the final investigation do not raise a genuine issue of material fact whether the stated reasons for the termination of plaintiff's employment are pretext for retaliation.

Plaintiff asserts that defendant's stated reasons for termination are pretextual because defendant did not follow its own procedures and policies which require an investigation when an employee complains of harassment or discrimination.  Memorandum In Support Of Plaintiff's Response (Doc. #79) at 76–77.  Plaintiff notes that she complained about harassment on January 23, 2017, May 16, 2018 and July 24, 2018, but HR did not conduct a complete investigation or give her a copy of the results of such investigations.  As to plaintiff's complaint to Wilson on July 24, 2018, defendant conducted an investigation.  In fact, Gangel based her decision to ultimately terminate plaintiff's employment on the results of that investigation.  As to plaintiff's complaints on January 23, 2017 and May 16, 2018, plaintiff does not cite record evidence to show that she made such complaints.  In any event, she has not explained how defendant's failure to conduct such an investigation on those occasions suggests that the reasons for her termination of employment in August of 2018 are pretext for retaliation.

In sum, viewing the evidence in a light most favorable to plaintiff, plaintiff has not demonstrated a genuine issue of material fact whether defendant's stated reasons for the

termination of her employment are pretext for retaliation.   Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's retaliation claim.[13]

**IT IS THEREFORE ORDERED** that Defendant University Of Kansas Hospital Authority's Motion For Summary Judgment (Doc. #67) filed October 1, 2019 is **SUSTAINED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion For Leave To File An Amended Response To Defendant's Motion For Summary Judgment (Doc. #82) filed December 5, 2019 is **OVERRULED**.

Dated this 25th day of March, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[13]      Although plaintiff does not assert it as pretext in the argument section of her brief, the Court notes that plaintiff presented evidence that at the meeting on August 8, 2018, Bosch told plaintiff that she "had not committed any offense to be terminated for, but since [] Gangel had issued [her] a final written warning in May (2018), that her employment was being terminated today." Plaintiff has not explained how Bosch's opinion is relevant. In any event, absent further context of the statement, it is insufficient by itself to suggest that Gangel's stated reasons are pretext for retaliation.

At the same meeting on August 8, Bosch also told plaintiff that UKHA "would like to offer [her] $20,000 to help with [her] transition" and that UKHA's counsel, Henry Thomas, would contact her with the details of the offer. Two days later, on August 10, 2018, Thomas called plaintiff and told her that the $20,000 offer that Bosch had made was contingent on plaintiff dropping her lawsuit against UKHA. The Court finds that this evidence also is insufficient to raise a genuine issue of material fact whether defendant's stated reasons for termination are pretext for retaliation. The fact that Bosch did not know or communicate all the terms of the offer does not show that Gangel did not terminate plaintiff's employment based on her communication issues and insubordination. Bosch told plaintiff that Thomas would get back to her on the details of the offer and he did so. Accordingly, Bosch's comments are insufficient to preclude summary judgment in favor of defendant on plaintiff's retaliation claim.